**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LEISURE SYSTEMS, INC.,                          CASE NO.: 1:11-cv-384

          Plaintiff,                          Judge Michael R. Barrett

    v.

ROUNDUP LLC, *et al.*,

          Defendant.

## OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on Plaintiff's Claims (Doc. 36), Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims (Doc. 41), and Defendants' Motion for Summary Judgment (Doc. 39).[1] All of these motions have been fully briefed and are now ripe for review.

## I.   BACKGROUND

The following facts are not disputed by the parties:

Plaintiff Leisure Systems, Inc. ("LSI") is an exclusive licensee of the name, character, symbol, design, likeness and visual representation of the Yogi Bear and related trademarks and service marks (the "Subject Marks") in connection with the construction, operation, and franchising of all Yogi Bear-identified campgrounds, including YOGI BEAR'S JELLYSTONE PARK CAMP-RESORTS in North America.

---

[1] Note that all Court document citations are to Docket Entry numbers.

(Doc. No. 6, ¶ 3).  The Subject Marks are registered with the United States Patent and Trademark Office.  (Doc. 37, ¶¶ 3-4, Exs. A-G).[2]

As franchisor, LSI licenses to its franchisees the right to use the Subject Marks and related materials.  Defendants Roundup, LLC, Yogi Michigan LLC and Lakeside, Incorporated are among those entities that became LSI franchises.  (Doc. 6, ¶ 11 and Ex. 1; Doc. 40, Exs. 1-3).[3]  Roundup is a campground located in Mantua, Ohio. (Doc. 40, ¶ 4 and Ex. 1).  Yogi Michigan is a campground located in Grand Haven, Michigan. (Doc. 40, ¶ 4 and Ex. 2).  Lakeside is a campground located in Monticello, Indiana. (Doc. 40, ¶ 4 and Ex. 3).  The franchisees are managed by a "Morgan" operation in New York.  (Doc. 36, Ex. 1, pp. 2-3;[4] Doc. 40, ¶¶ 6-13).  Robert Moser runs Morgan RV Resorts, and he has an ownership interest in all three franchises.  (Doc. 40, ¶¶ 2, 12). Robert Morgan is a business associate of Mr. Moser who runs Morgan Management, LLC.  (Doc. 40, ¶¶ 6-11).  LSI had a separate Franchise Agreement with each of those franchisees.  (Doc. 6, ¶¶ 11-12; Doc. 40, ¶ 3 and Exs. 1-3).  The Franchise Agreements with Roundup and Yogi Michigan are governed by Ohio law, whereas the Franchise Agreement with Lakeside is governed by Indiana law.  (Doc. 40, Exs. 1-3 at Art. XIII(k)).

The Franchise Agreements required Roundup, Yogi Michigan and Lakeside to, among other things, (a) pay bi-weekly royalty and service fees; (b) pay bi-weekly marketing, advertising and promotional fees; (c) provide bi-weekly royalty reports; and (d) provide annual financial statements for the parks to LSI.  (*See generally* Doc. 40,

---

[2] The Subject Marks include those with the following registration numbers: 1,288,110, 1,270,196, 1697,963, 1,714,065, 3,892,212, 3,047,537, 2,635,083.

[3] Exhibits A, B and C of Document 1 are identical to Exhibits 1, 2 and 3 of Document 40, respectively. Throughout this opinion, the Court will provide citations to Exhibits 1, 2 and 3 of Document 40 only.

[4] The page numbers cited are those provided by the Court's electronic filing system.

Exs. 1-3).  LSI may terminate the Franchise Agreements under certain conditions when a franchisee fails to perform its contractual obligations.  (Doc. 40, Exs. 1-3 at Art. XI(b)).  Of relevance here is the provision that permits LSI to terminate the Franchise Agreements for failure to pay any amount due under such agreements.  (Doc. 40, Exs. 1-3 at Art. XI(b)(iii)).  That provision provides, in pertinent part:

> (b)  Termination by LSI: In addition to the provisions for termination provide elsewhere herein . . . this Agreement may be terminated at LSI's option; . . .
>
> (iii) If FRANCHISEE shall fail to pay when due any amount which may become due to LSI pursuant to this Agreement or if FRANCHISEE shall fail to pay when due any other amount which may become due to LSI for merchandise, equipment or otherwise, and such failure or failures continue for a period of five (5) days or more following written notice by LSI to FRANCHISEE . . . .

(Doc. 40, Exs. 1-3 at Art. XI(b)(iii)).

The Franchise Agreements of Roundup and Yogi Michigan also provide for the award of liquidated damages in the event of termination to be calculated pursuant to the formula set forth therein.  (Doc. 40, Exs 1-2 at Art. XI(c)).  The Lakeside Franchise Agreement does not contain a liquidated damages provision.  (*See generally* Doc. 40, Ex. 3).

Under all three Franchise Agreements, notices or demands are "deemed to have been delivered by hand, one (1) business day after transmission by telegraph or other electronic system or three (3) business days after placement in the United States Mail by Registered or Certified Mail, postage prepaid and addressed" as indicated in the Franchise Agreement, or to "such other address as the party to which such notice is directed may have designated by notice in writing given pursuant to this paragraph." (Doc. 40, Exs. 1-3 at Art.  XIII(d)).  For Roundup, the address listed in the Franchise

Agreement is 6290 Plastermill Road, Victor, NY 14564. (Doc. 40, Ex. 1 at Art. XIII(d)). For Yogi Michigan, there is not a specific notice address listed in the Consent to Transfer or corresponding Addendum that transferred the franchise to Yogi Michigan; instead, the last listed notice address for the franchise operation is listed in the January 1, 1994 Franchise Agreement between LSI and Yogi Michigan's predecessor franchise operator wherein the notice address is 10900 US 31N, Grand Haven, MI 49417. (*See* Doc. 40, Ex. 2). Finally, for Lakeside, the notice address listed in the Franchise Agreement is 306 Indiana Beach Drive, Monticello, Indiana 47960. (Doc. 40, Ex. 3 at Art. XIII(d)).

On May 18, 2009, Robert E. Schutter, Jr., President/Chief Operating Officer of LSI, sent an email to Rick McCurley, the then-Chief Financial Officer of Morgan RV Resorts, inquiring about a purported relocation and where to send correspondence to Mr. McCurley and Mr. Moser. (Doc. 40, ¶¶ 17-18 and Ex. 4). Using email address rick.mccurley@morganmanagement.com, Mr. McCurley responded to Mr. Schutter, indicating that he wanted all future correspondence for Mr. Moser and him to be sent to Morgan RV Resorts, 63 Putnam Street, Saratoga Springs, New York 12866. (Doc. 40, ¶¶ 17-18 and Ex. 4).

More than one year later, on September 24, 2010, LSI sent certified letters that were received by Roundup and Yogi Michigan, which notified those franchisees of defaults on their obligations under the Franchise Agreements and of the need to cure those defaults or face termination of the Franchise Agreements. (Doc. 37, ¶ 9 and Exs. O-P). The certified letters for the respective franchises were addressed to Robert C. Morgan c/o Morgan Management, LLC at 63 Putnam St., Suite 201, Saratoga Springs,

NY 12866. (Doc. 37, ¶ 9 and Exs. O- P). LSI received signature confirmations for both letters. (Doc. 37, Exs. O-P). No certified letter was sent regarding Lakeside at this time. (*See generally* Doc. 37).

On December 16, 2010, Mr. Schutter emailed Ron Mnieckowski, at email address ron.mnieckowski@morganmanagement.com, regarding past due accounts for Roundup, Yogi Michigan and Lakeside, noting that only a small partial payment had been remitted to the outstanding accounts. (Doc. 45, Ex. 1, pp. 11-13).[5] Mr. Schutter requested on behalf of LSI that all accounts be brought current by December 23, 2010, otherwise the matter would be assigned to legal counsel for further action. (*See* Doc. 45, Ex.1, p. 11). On December 17, 2010, Mr. Mnieckowski responded to Mr. Schutter that he would "escalate the matter." (*See* Doc. 45, Ex. 1, p. 13). The signature block on Mr. Mnieckowski's response listed him as Chief Financial Officer for Morgan RV Resorts with an address of 63 Putnam St., Suite 201, Saratoga Springs, NY 12866. (Doc. 45, Ex. 1, p. 13).

On January 10, 2011, LSI sent letters via UPS overnight delivery to Roundup, Yogi Michigan and Lakeside. (Doc. 37, ¶ 10 and Exs. Q-S). The letter for each franchise was addressed to Robert C. Morgan c/o Morgan Management, LLC at 1170 Pittsford-Victor Road, Suite 100, Pittsford, NY 14534. (Doc. 37, Exs. Q-S). No certifications of receipt have been provided to the Court for those letters. (*See generally* Doc. 37). In the letters, LSI represented: "Repeated requests to have your account brought current have been only partial successful. Our last written request of December 16, 2010 to Mr. Ron Mnieckowski, your Chief Financial Officer, was only partially

---

[5]All citations to page numbers in regards to Doc. 45, Ex. 1 are to the page numbers provided by the Court's electronic filing system.

fulfilled.  Therefore, [LSI] is compelled to proceed with the following course of action."
(Doc. 37, ¶ 10 and Exs. Q-S).  LSI further stated in the letter to Yogi Michigan that its
account was in default and that it was granted pursuant to Article XI(b)(iii) of the
Franchise Agreement "a period of no more than thirty (30) days from the date you
receive this notice in which to cure said defaults" before the matter would be assigned
to legal counsel which may result in termination.  (Doc. 37, Ex. Q).  It stated in the letter
to Roundup that Roundup's accounts were in default and that it failed to remit bi-weekly
reports, and it indicated that pursuant to Article XI(b)(iii) of the Franchise Agreement, it
had a period of "no more than fifteen (15) days from the date you receive this notice in
which to cure said defaults" before the matter would be assigned to legal counsel which
may result in termination.  (Doc. 37, Ex. R).  As for Lakeside, LSI stated in the letter that
Lakeside's accounts were in default, and that pursuant to Article XI(b)(iii) of the
Franchise Agreement it had a period of "no more than fifteen (15) days from the date
you receive this notice in which to cure said defaults" before the matter would be
assigned to legal counsel which may result in termination. (Doc. 37, Ex. S).  Mr. Moser
testified he did not receive any of these letters because they were not sent to 63
Putnam Street, Saratoga Springs, New York.  (Doc. 40, ¶ 23; Doc. 48, Ex. A, pp. 2-3).[6]

On February 24, 2011, LSI, through counsel, sent letters via certified mail
terminating the Franchise Agreements, requesting past due amounts and liquidated
damages payable by March 11, 2011, and demanding that the franchisees cease using
LSI's marks and remove and return all identifying materials pursuant to the Franchise
Agreements by March 24, 2011.  (Doc. 38, Exs. A-C).  The letters were addressed to

_____

[6] All citations to page numbers in regard to Doc. 48, Ex. A are to the page numbers provided by the
Court's electronic filing system.

each of the Defendants at what purportedly was the campground location[7] and to Robert C. Morgan c/o Morgan Management LLC at 1170 Pittsford-Victor Road Suite 100, Pittsford, NY 14535. (Doc. 38, Exs. A-C). A certified mail signature was received on at least one letter sent to each franchisee. (Doc. 38, Exs. A-C; *see also* Doc. 6, ¶ 21 and Exs. D-F).

Mr. Moser testified that he did not become aware of LSI's default notice until approximately March 2011. (Doc 40, ¶ 27; Doc. 48, Ex. A, p. 2). Specifically, in his deposition he testified he became aware on or about March 3, 2011 that some documents had been sent by LSI (Doc. 48, Ex. 1, p. 3), and in his declaration states he did not become aware of the 2011 "payment issues under the franchise agreement until March 21, 2011" (Doc. 40, ¶ 27).

On March 2, 2011, counsel for LSI purportedly received a telephone call from counsel for Defendants regarding the "franchise terminations," and on March 3, 2011, counsel for LSI emailed the February 2011 termination letters to Defendants' counsel. (Doc. 46, ¶¶ 3, 7 and Ex. D). On March 8, 2011, a telephone call purportedly occurred between counsel for Defendants, counsel for LSI, Mr. Schutter and Mr. Moser. (Doc. 46, ¶ 4).

On or about March 22, 2011, LSI's counsel sent an email to Defendants' counsel stating:

---

[7]The park location address used in the letter to Lakeside was 5224 E. Indiana Beach Road, Monticello, IN 47960 whereas the notice address in the Franchise Agreement was 306 Indiana Beach Drive, Monticello, IN 47960. (Doc. 38, Ex. A; Doc. 40, Ex. 3). The park location address used in the letter to Yogi Michigan was 42180 Ford Road Suite 101, Canton, MI 48187 whereas the notice address in the Franchise Agreement was 10900 US 3IN Grand Haven, MI 49417. (Doc. 38, Ex. C; Doc. 40, Ex. 2). Only the Roundup address was identical to the address listed in the Franchise Agreement. (Doc. 38, Ex. B; Doc. 40, Ex. 1).

> Thank you for your call yesterday. I have conferred with my client. It will agree to reinstate the three franchise agreements that were terminated through our recent written notifications, provided that the franchisees: (1) immediately pay to LSI all outstanding royalties and other sums owed under the franchise agreements; and (2) provide personal guarantees from Robert Moser and Robert Morgan for all future financial obligations of the franchisees under the respective franchise agreements.

(Doc. 46, Ex. F; *see also* Doc. 40, ¶¶ 28-31). Defendants' counsel responded that the guarantees were acceptable to Defendants, and requested a chance to review them. (Doc. 46, Ex. G). From that time through approximately April 2011, the parties continued to correspond regarding payments and the guarantees. (Doc. 46, ¶ 7 and Exs. G-K; *see also* Doc. 40, ¶¶ 28-32).

On May 9, 2011, LSI's counsel sent an email to Defendants' counsel indicating that LSI had instructed him to start de-identifying unless signed guarantees were in hand the following day. (Doc. 46, ¶ 7 and Ex. L). On May 16, 2011, LSI's counsel sent an email to Defendants' counsel directing that the past due amounts be sent, and advising that LSI was implementing the terminations set forth in its February 24, 2011 letters, including the request that the marks of LSI cease to be used by Defendants in accordance with the Agreement. (Doc. 40, ¶ 36 and Ex. 9; Doc. 46, ¶ 7 and Ex. M). On May 17, 2012, Mr. Moser emailed Mr. Schutter requesting to speak about the future of their business relationship, but Mr. Schutter did not respond. (Doc. 40, ¶¶ 38-39 and Exs. 10-11).

On June 3, 2011, LSI's counsel informed Defendants' counsel that LSI was not interested in a resolution, and instructed Defendants' counsel to have Defendants immediately cease use of all LSI's marks. (Doc. 40, ¶ 41 and Ex. 11). Defendants began de-identification after June 3, 2011. (Doc. 40, ¶¶ 42-45). The Franchise

Agreements contained provisions relating to de-identification after termination. (Doc. 40, Exs. 1-3 at Art. XI(d)).

In or about June 2011, John Ellison, the then-Vice President of Operations of LSI, received a telephone call from Robert Friel, who stated that he had recently been a guest at the Jellystone Park Camp-Resort in Grand Haven, Michigan operated by Yogi Michigan and that he had complaints about his stay. (Doc. 42, ¶ 3). Mr. Friel followed up with a letter dated June 14, 2011 that detailed at least twelve specific complaints. (Doc. 42, Ex. A). Mr. Ellison responded to Mr. Friel stating:

> We are very much aware of the circumstances of the Morgan Management operation. As a result we have terminated all the franchises under the Morgan Management ownership. It is a shame that through poor decisions and money management Morgan has taken a very successful operation and rendered it to the level it has become which is despicable. Hopefully there will be other campgrounds that will be interested in filling the void that these parks have left. We apologize for the inconveniences this has caused Yogi Bear campers but there was no positive response from Morgan to improve so it left us no choice.

(Doc. 42, Ex. B; *see also* Doc. 40, ¶¶ 58-59 and Ex. 15). Mr. Moser has stated that he also received calls from his property managers, other employees and customers informing him that LSI was making "defamatory statements" about Morgan Management. (Doc. 40, ¶ 59).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. <u>ANALYSIS</u>

LSI seeks summary judgment on (1) the issues of liability and damages for its breach of contract claim, (2) the issue of liability only as to its claim for false representation of origin/unfair competition under the Lanham Act and at common law; and (3) all of Defendants' counterclaims. (Doc. 36; Doc. 41).[8] Defendants, on the other

---

[8]LSI originally brought five claims for relief, which included (1) Breach of the Franchise Agreements, (2) Trademark and Service Mark Infringement, (3) False Representation of Origin/Unfair Competition, (4) Dilution, and (5) Injunction. The Court dismissed the first claim as to Defendant Morgan only, and dismissed the second and fourth claims in their entirety. (Doc. 18).

hand, seek summary judgment on (1) LSI's breach of contract claim, (2) LSI's claim for false representation of origin and unfair competition under the Lanham Act and at common law, and (3) Defendants' breach of contract counterclaim.  (Doc. 39).

The Court will start by addressing the parties' arguments as to LSI's two claims. It then will turn to the parties' arguments on Defendants' counterclaims.

## A. LSI's Claims

### 1. Breach of contract by Defendants

The parties have filed cross-motions for summary judgment on LSI's claim for Defendants' alleged breaches of the Franchise Agreements.  (Doc. 36, pp. 6-11; Doc. 39, pp. 10-17).  LSI says it is clear that Defendants breached the agreements, whereas Defendants say that it is clear that LSI breached the agreements.  Given that there is no dispute as to the governing laws, the breach of contract claims as to Roundup and Yogi Michigan will be analyzed under Ohio law and the breach of contract claim as to Lakeside will be analyzed under Indiana law.

To prove a breach of contract under either Ohio law or Indiana law, the following elements must be established: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App. 3d 770, 778, 798 N.E.2d 1141, 1147 (Ohio App. 2003); *Rogier v. American Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. App. 2000).  "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined."  *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St. 3d 321, 322, 474 N.E.2d 271, 272 (Ohio 1984)*. Accord: Rogier*, 734 N.E.2d at 616.

The parties do not dispute the existence of a valid contract. However, the rest of the elements are disputed. The Court therefore addresses each of the latter three elements. For the reasons explained below, summary judgment is granted in part, and denied in part, to LSI on this claim, and summary judgment also is granted in part, and denied in part, to Defendants on this claim.

### a)      LSI's performance

The first issue is whether LSI performed its obligations under the three Franchise Agreements. There does not appear to be any dispute that LSI performed each of its obligations under the three Franchise Agreements up through the time that Roundup, Yogi Michigan and Lakeside defaulted on their respective obligations. Where the parties part ways, however, is on whether LSI (1) adhered to the Franchise Agreements' notice provisions regarding default and termination, and (2) anticipatorily repudiated the Franchise Agreements by requesting personal guarantees. After reviewing both arguments, the Court concludes that LSI substantially performed its obligations and did not anticipatorily repudiate those obligations. Accordingly, summary judgment is granted to LSI, and denied to Defendants, as to this element of LSI's breach of contract claim.

### (1)      Notice provisions

The issue of notice of both default and termination is a point of contention between the parties. On the one hand, Defendants claim that notice must be sent to the address it designated in an email to LSI, and not to any other address, in order for the notice to be effective, and that by failing to properly send the notice, LSI failed to meet a condition precedent of its breach of contract claim. (Doc. 39, pp. 12-13; Doc. 43, pp. 9-11). On the other hand, LSI contends that the Franchise Agreements did not provide for

notice exclusively to the address listed in the Franchise Agreements or to the address separately designated by Defendants, and that LSI provided proper notice under the Franchise Agreements. (Doc. 45, pp. 1-6; Doc. 50, pp. 1-5). LSI also argues that Defendants' designation of a different address was ineffective under the Franchise Agreements. (Doc. 50, p. 4).

The address to which Defendants alleged notice was properly sent under the Franchise Agreement is 63 Putnam Street, Saratoga Springs, New York. (*See* Doc. 39, pp. 5-6, 10-13; Doc. 43, pp. 3-7; Doc. 51, pp. 3-10). Defendants' basis for contending that is the notice address is a May 9, 2009 email from Mr. McCurley, the then-CFO of Morgan RV Resorts, to Mr. Schutter informing him that correspondence to Mr. McCurley and Mr. Moser was to be sent to that address in Saratoga Springs, New York. (*See* Doc. 39, pp. 5-6, 10-13; Doc. 43, pp. 3-7; Doc. 51, pp. 3-10; *see also* Doc. 40, ¶¶ 17-18, and Ex. 4). LSI's counsel was not copied on the email. (Doc. 40, ¶¶ 17-18 and Ex. 4). Under the Franchise Agreements, a change of address could be made by giving notice in writing pursuant to the notice provision. (Doc. 40, Exs. 1-3 at Art. XIII(d)). Under the Franchise Agreements, notice was deemed delivered to LSI when it was sent to LSI and its counsel. (Doc. 40, Exs. 1-3). Although the Court finds that the notice was not given as expressly required under the Franchise Agreements since counsel for LSI was not copied on the email, and the email correspondence makes no reference to the Franchise Agreements, that finding is not outcome determinative. Regardless of whether the change of address was given by Defendants in accordance with the express provisions, the Court finds that LSI substantially performed its notice obligations under the Franchise Agreements.

As mentioned above, the notice provisions of the Franchise Agreements provide that notice "shall be deemed delivered" within a specified time when it is sent in the manner outlined in the Franchise Agreements. (Doc. 40, Exs. 1-3 at Art. XIII(d)). Those provisions provide the party sending the notice with a presumption of delivery and, thus, with some assurance that the other party receives the notice. However, the plain language of the notice provisions does not mandate that notice be sent to the designated address. (*See* Doc. 40, Exs. 1-3 at Art. XIII(d)). As such, a party may send notice to an address not listed in or designated pursuant to the Franchise Agreements without being in breach of those agreements. Nevertheless, notices that are not sent as provided for in the Franchise Agreements are not given a presumption of delivery under the express terms of the agreements. (*See* Doc. 40, Exs. 1-3 at Art. XIII(d)).

The purpose of including notice provisions in contracts is "to allow a breaching party to cure any defect in its performance." *Midwest Payment Sys., Inc. v. Citibank Fed. Sav. Bank*, 801 F. Supp. 9, 13 (S.D. Ohio 1992). What is of importance is that the breaching party receive actual notice and an opportunity to cure. *Stonehenge Land Co. v. Beazer Homes Invs.*, 177 Ohio App. 3d 7, 18-19, 893 N.E.2d 855, 863 (Ohio App. 2008) (citing *Interstate Gas Supply, Inc.*, *v. Calex Corp.*, No. 04Ap-980, 2006 Ohio App. LEXIS 575, at *23-24 (Ohio App. Feb. 14, 2006)) (internal quotations and citations omitted). *Accord: Biomet, Inc. v. Smith*, 238 F. Supp. 2d 1036, 1049 (N.D. Ind. 2002) (granting summary judgment to the plaintiff after determining that plaintiff's deviation from a contractual notice provision was not a material breach); *Puller Mortg. Assocs. v. Keegan*, 829 F. Supp. 1507, 1518 (S.D. Ind. 1993) ("A party who acts in good faith and who performs substantially all that is required of him by a contract may recover from the

other party -- less any damage sustained by the other party for minor defects in performance. Substantial performance is something less than strict performance, but only in some nonessential way and is practically as good as strict performance.") (citing *McConnell v. Fulmer*, 230 Ind. 576, 103 N.E.2d 803 (1952)). "[W]here there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that had actual notice." *Stonehenge Land Co.*, 177 Ohio App. 3d at 18. *Accord: Biomet, Inc.*, 238 F. Supp. 2d at 1049; *Puller Mortg. Assocs.*, 829 F. Supp. at 1518.

> "The long and uniformly settled rule as to contracts requires only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract. A court should confine the application of the doctrine of substantial performance to cases where the party has made an honest or good faith effort to perform the terms of the contract. For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract. Furthermore, when the facts presented in the case are undisputed, whether they constitute performance or a breach of the contract, is question of law for the court."

*Stonehenge Land Co.*, 177 Ohio App. 3d at 18-19 (quoting *Interstate Gas Supply, Inc.*, 2006 Ohio App. LEXIS 575, at *23-24) (internal quotations and citations omitted). *Accord: Puller Mortg. Assocs.*, 829 F. Supp. at 1518.

The first default notices sent by LSI were the September 14, 2010 letters to Roundup and Yogi Michigan at the Saratoga Springs, New York address that was purportedly designated by Defendants pursuant to the Franchise Agreements by email in May 2009. (Doc. 37, Exs. O-P). In those notices, LSI informed Roundup that it was in default for its royalty payments and its marketing, advertising, promotional and finance charges from October 2009 through August 2010 (Doc. 37, Ex. O-P), and informed Yogi Michigan that it was in default for its royalty payments and its marketing,

advertising, promotional and finance charges from November 2009 through August 2010 (Doc. 37, Exs. O-P). LSI further informed Roundup and Yogi Michigan that they had five days to cure pursuant to the Franchise Agreements. (Doc. 37, Exs. O-P). Given that those notices were sent to the address that Defendants purportedly designated pursuant to the Franchise Agreements, Roundup and Yogi Michigan do not dispute that those notices were properly sent to them by LSI or that they received those notices. As such, those notices were either properly sent to the address designated by Roundup and Yogi Michigan pursuant to the Franchise Agreements, or at a minimum, Roundup and Yogi Michigan were actually aware of those default notices and had an opportunity to cure their defaults. As such, LSI performed, or substantially performed, its obligations, and therefore did not breach the Franchise Agreements by sending those default notices to Roundup and Yogi Michigan. Further, neither Roundup nor Yogi Michigan argue that they cured their defaults within the requisite five-day period or that they fully cured these defaults prior to becoming aware of the February 2011 termination notices. As such, LSI could, under the Franchise Agreements, terminate the Roundup and Yogi Michigan agreements after the five-day cure period expired.

The next notice of default was given on December 16, 2010 when Mr. Schutter informed Mr. Mnieckowski, the then-CFO of the company managing the Defendant franchise operations, via email that all three Defendants – Roundup, Yogi Michigan and Lakeside – had past due accounts and that only a small partial payment had been remitted to the outstanding accounts. (Doc. 45, Ex. 1, pp. 12-13). Mr. Schutter requested on behalf of LSI that all accounts be brought current by December 23, 2010

or else the matter would be assigned to legal counsel for further action. (*See* Doc. 45). Mr. Mnieckowski responded that he would "escalate the matter." (*See* Doc. 45).

Considering the notice and the plain language of the Franchise Agreements, the Court finds that LSI performed, or substantially performed, its notice obligations when it sent that email to Mr. Mnieckowski. First, Mr. Mnieckowski was the CFO for Morgan RV Resorts whose address was listed in the email as the Saratoga Springs, New York address to which Defendants claim notice was proper. (*See* Doc. 45, Ex. 1, p. 13). Second, in the May 2009 email that Defendants claim properly designated to whom and to where notice should be sent under the Franchise Agreements, one of the individuals designated was Morgan RV Resorts' former CFO, Mr. McCurley. If notice was proper to Mr. McCurley, then it would be logical that notice should also be proper to Mr. McCurley's successor, Mr. Mnieckowski. Third, the notice provision in the Franchise Agreements plainly provides for notice by an "electronic" transmission, which is to be deemed delivered one business day after it is sent. (Doc. 40, Exs. 1-3 at Art. XIII(d)). Since Mr. Schutter sent the email message on Thursday, December 16, 2010, it would, if sent as designated by Defendants under the Franchise Agreements, be deemed delivered on Friday, December 17, 2010. (*See* Doc. 45, Ex. 1, p. 13; Doc. 40, Exs. 1-3 at Art. XIII(d)). Fourth, there is no dispute that Mr. Mnieckowski actually received the email by Friday, December 17, 2010 given his response email to Mr. Schutter on that day indicating that he would "escalate the matter." (Doc. 45, Ex. 1, p. 13). Defendants therefore had actual notice of the defaults. Fifth and finally, after the notice was deemed delivered, or was actually received by Mr. Mnieckowski, Defendants were given by LSI until December 23, 2011 to cure those defaults, which is more than the five days

required under the Franchise Agreements. Therefore, Defendants had an opportunity to cure any defaults within the time provided by the Franchise Agreement. There is no evidence presented to the Court that any payments were made to fully cure the past defaults of Lakeside, or to fully cure the past defaults of Roundup and Yogi Michigan, including those defaults set forth in the September 24, 2010 default notice. There also is no indication that any cure occurred within the requisite time period. As such, LSI had the right under the Franchise Agreements to terminate those agreements on or after December 23, 2010. Any deviation from the Franchise Agreements' notice provision with respect to this notice was trifling, minor or technical, and did not result in a breach of the Franchise Agreements by LSI.

LSI sent a third round of default notices to Roundup, Yogi Michigan and Lakeside on or about January 10, 2011. (Doc. 37, Exs. Q-S). Those default notices indicated that if Roundup, Yogi Michigan and Lakeside still were in default and that if they did not cure their defaults within the stated timeframe, then the matter would be referred to legal counsel for further action and possible termination. (Doc. 37, Exs. Q-S).[9] Those default notices, however, were sent to the Pittsford, New York address, which is not an address listed in any of the Franchise Agreements or an address purportedly designated by Defendants. Instead, it is the address of Mr. Moser's business partner, Robert Morgan, who Defendants contend does not manage Morgan RV Resorts and

---

[9]Specifically, as to Roundup, the defaults included past due royalty and service fee payments and marketing, advertising and promotional fee payments for July 19 through December 31, 2010, a merchandise invoice and related finance charges for September 2010 and failure to remit bi-weekly reports for July 19 through December 31, 2010. (Doc. 37, Ex. R). As to Yogi Michigan, the defaults include royalty and service fee payments in the amount of $7,163.29 and marketing, advertising and promotion fee payments in the amount of $630.32 for the 2010 calendar year as well as related finance charges. (Doc. 37, Ex. Q). With respect to Lakeside, the defaults include royalty and service fee payments in the amount of $9,243.32 and marketing, advertising and promotional fee payments in the amount of $1,749.99 for the 2010 calendar year and related finance charges. (Doc. 37, Ex. S).

who instead manages Morgan Management, which does not handle the campground business.  (*See* Doc. 40, ¶¶ 6-16).[10]    LSI argues, however, that it was sent to Mr. Morgan who is (1) the namesake of Morgan RV Resorts and Morgan Management, LLC; (2) Mr. Moser's business partner; (3) an owner-principal of Defendants; and (4) the signatory on the Roundup Franchise Agreement.  (Doc. 45, p. 5) (citing Doc. 37, ¶ 10 and Exs. Q-S; Doc. 40, Ex. 1, p. 20; Doc. 45, Ex. 1. pp. 4-6).

Looking solely at the addresses listed in the Franchise Agreement and the address purportedly designated by Defendants, those notice letters were not sent as expressly provided for in the Franchise Agreements.  However, the Court finds that LSI substantially performed by sending this notice.  As explained above, the Franchise Agreements' notice provision was not mandatory.  In its prior communications, LSI had addressed them to Mr. Morgan at Morgan Management, and there is no evidence that Defendants informed LSI that Mr. Morgan was not involved in the campground business or that communications should not be addressed to him.  In fact, Mr. Mnieckowski and Mr. McCurley both had email addresses that used the domain name of morganmanagement.com, suggesting a possible involvement by Morgan Management in the franchise operations.

In any event, there is no dispute that Defendants had actual notice that they were in default of their obligations pursuant to the September 24, 2010 and the December 15, 2010 default notices.  There also is no dispute that Defendants had not fully cured the defaults of which they were made aware in those default notices, either within the five-

---

[10]Although not an issue raised by the parties, the Court notes that the address listed for both Morgan RV Resorts and Morgan Management by the New York Department of State, Division of Corporations, State Records & UCC is the Pittsford, New York address. *See* http://www.dos.ny.gov/ corps/bus_entity_search. html  (last visited October 17, 2012).

day cure period or otherwise. As such, the plain language of the Franchise Agreement permitted LSI to terminate the three franchisees for a default of their account payment obligations five or more days after the written notice.

Nothing in the Franchise Agreement provides for the forfeiture of that right to terminate for failure to cure an account payment default within the five-day period proscribed therein under any circumstances. As such, after a notice of default, the failure to cure within the proscribed period of time or thereafter remained a valid basis for termination. Further, nothing in the Franchise Agreements gives Defendants a right to additional notices of default after a failure to cure defaults of their payment obligations. (Doc. 40, Exs. 1-3 at Art. XI(b)).[11] Therefore, Defendants, knowing that they were in default of their obligations and that LSI still had the right to terminate if those defaults were not cured within five days, should have been engaging in efforts to cure their defaults if they did not desire that the Franchise Agreements be terminated. Their failure to do so shows a lack of diligence on the part of Defendants, and not a breach by LSI. As such, the Court finds that LSI substantially performed its obligations with respect to sending default notices under the Franchise Agreements.[12]

The Court now turns to the termination notices sent by LSI. The termination provision at issue here provides that LSI may terminate the franchisee at its option

---

[11]Unlike Article XI(a) and Article XI(b)(vi) of the Franchise Agreements that provide that continuing efforts to cure a failure to perform will be sufficient to prevent termination, there is no such "continuing efforts" language in Article XI(b)(iii) at issue here and which provides for termination for failure to cure within five or more days following written notice. (Doc. 40, Exs. 1-3 at Art. XI(b)).

[12]Although the January 2011 notice to Roundup raises the additional default of failure to provide timely bi-monthly reports, the Court does not find that matter to be outcome determinative. Although Roundup did not have the opportunity to cure that particular default if it did not become aware of it until March 2011, it did have the opportunity to cure the account defaults but failed to do so within the proscribed time period. As such, LSI could have terminated Roundup for the continued default on the accounts in the February 2011 termination notice independent of any cure of the default on bi-monthly reports.

> (iii) If FRANCHISEE shall fail to pay when due any amount which may become due to LSI pursuant to this Agreement or if FRANCHISEE shall fail to pay when due any other amount which may become due to LSI for merchandise, equipment or otherwise, and such failure or failures continue **for a period of five (5) days or more following written notice by LSI to FRANCHISEE**;

(Doc. 40, Exs. 1-3 at Art. XI(b)(iii)) (emphasis added). As previously mentioned, the Franchise Agreements do not contain a specific requirement as to when termination must occur after a failure to cure. Nor is there any mention that termination must be in writing. Rather, unlike another one of the termination provisions in the Franchise Agreements, the specific termination provision at issue here only provides for termination five or more days after written notice of default has been given to the franchisee.[13] In other words, there is a written notice requirement for default but not similar written notice requirement for termination. The right to terminate therefore arose under the Franchise Agreement regardless of notice. Nevertheless, given the responsibilities and obligations of Defendants that arose upon termination, the termination would not be effective until Defendants were aware that the franchises had been terminated by LSI.

On February 24, 2011, the termination notices were sent by LSI to Roundup, Yogi Michigan and Lakeside. (Doc. 38, ¶ 2 and Exs. A-C). The letters were sent by certified mail to the Pittsford, New York address. (Doc. 38, ¶ 2 and Exs. A-C). The letters also were sent to other addresses for Yogi Michigan and Lakeside, which are not the precise ones provided for in the Franchise Agreement, and to another address for Roundup, which is provided for in the Franchise Agreement. (Doc. 38, Exs. A-C). LSI received a certified mail signature for a termination notice for each franchisee. (Doc.

---

[13]For example, ArticleXI(b)(i)-(ii) specifically provide for termination "upon notice." (Doc. 40, Exs. 1-3 at Art. XI(b)(i)-(ii)).

38, Exs. A-C).   There is evidence that on attorneys retained to represent Defendants called LSI's counsel to discuss the terminations on March 2, 2011 (Doc. 46, ¶ 3), and evidence that copies of the termination letters were delivered to Defendants' counsel one day later (Doc. 46, ¶ 3 and Ex. D).   There also is evidence that suggests that on or about March 8, 2011, Mr. Moser participated in a telephone call with Mr. Schutter and their respective counsel regarding the terminations.   (Doc. 46, ¶ 4).   Moreover, Mr. Moser admits that he became aware of the termination, but claims that the awareness did not occur until March 21, 2011.  (Doc. 40, ¶ 27).

Based on these facts, the Court finds that LSI performed, or substantially performed, its obligations for the same reasons articulated above with respect to the January 2011 default notices.   Defendants had, through counsel retained by them or through personal knowledge or receipt of the termination notices, actual awareness of the terminations.   Accordingly, the Court concludes that LSI's termination notice was effective, and did not constitute a material breach of the Franchise Agreements.[14]

Summary judgment is granted to LSI, and denied to Defendants, on the issue of notice.

### (2)   Anticipatory repudiation

Defendants argue that LSI breached the Franchise Agreements by anticipatory repudiation when it requested personal guarantees from Defendants.   (Doc. 39, p. 14; Doc. 43, pp. 11-12).   LSI disagrees.   (Doc. 45, pp. 9-10; Doc. 50, pp. 6-7).

---

[14]The Court notes that there are genuine issues of material fact as to whether any of the termination notices sent to the campgrounds were proper under the Franchise Agreements, and if not, then as to when Defendants actually became aware of the February 24, 2011 termination notices.  However, those issues go to when the termination notices were effective, which is relevant to a determination of damages and to LSI's unfair competition claim.

When a party to a contract declares that it will not perform the terms of the contract, an anticipatory repudiation occurs and the injured party can immediately maintain an action for breach. *Cambridge Co. v. Telsat Inc.*, C.A. No. 23935, 2008 Ohio App. LEXIS 917, at *7 (Ohio App. Mar. 12, 2008) (citing *W.O.M., Ltd. v. Willys-Overland Motors, Inc.*, No. L-05-1201, 2006 Ohio App. LEXIS 6907, at *12 (Ohio App. Dec. 29, 2006)); *Angelone v. Chang*, 761 N.E.2d 426, 429 (Ind. App. 2001); *Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. App. 1991). "To prevail on a claim of anticipatory breach of contract, a plaintiff must establish that there was a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance, causing damage to the plaintiff." *Cambridge Co.*, 2008 Ohio App. LEXIS 917, at *7 (quoting *Banks v. Bob Miller Builders, Inc.*, No. 01AP-582, 2001 Ohio App. LEXIS 5672, at *9 (Ohio App. Dec. 18, 2001). *Accord: Angelone*, 761 N.E.2d at 429; *Eden United, Inc.*, 573 N.E.2d at 929. A request for cancellation or for a change in the terms of an agreement is insufficient, and "[t]he repudiation must be expressed in clear and unequivocal terms[.]" *Cambridge Co.*, 2008 Ohio App. LEXIS 917, at *7-8 (quoting *McDonald v. Bedford Datsun*, 59 Ohio App. 3d 38, 40, 570 N.E.2d 299 (1989), quoting 4 Corbin, Contracts 905-06, Section 973 (1951)). *Accord: Angelone*, 761 N.E.2d at 429; *Eden United, Inc.*, 573 N.E.2d at 929. Anticipatory repudiation of a contract has been found where there is an overt action indicating that performance will not be tendered. *Cambridge Co.*, 2008 Ohio App. LEXIS 917, at *8 (citing *Farmers Comm'n Co. v. Burks*, 130 Ohio App.3d 158, 173, 719 N.E.2d 980 (1998); *Integra Nat'l Bank v. Oakes Constr. Co.*, Nos. 16248, 16281, 16300, 1994 Ohio App. LEXIS 1045, at *20 (Ohio App. Mar. 9, 1994); *Wilson v. Bd. of Trs. of Ohio State Univ.*, No. 91AP-144, 1991 Ohio App. LEXIS

6303, at *44 (Ohio App. Dec. 24, 1991)).  *Accord: Angelone*, 761 N.E.2d at 429; *Eden United, Inc.*, 573 N.E.2d at 929.  Indirect inferences are not sufficient. *Cambridge Co.*, 2008 Ohio App. LEXIS 917, at *8 (citing *Sentinel Consumer Prods. Inc. v. Mills, Hall, Wallborn & Assoc.*, 110 Ohio App. 3d 211, 213-15, 673 N.E.2d 967 (1996)).  *Accord: Angelone*, 761 N.E.2d at 429; *Eden United, Inc.*, 573 N.E.2d at 929.

Here, Defendants have not presented a genuine issue of material fact as to whether LSI breached the Franchise Agreements by anticipatory repudiation.  On or about March 22, 2011, when LSI requested personal guarantees from Mr. Morgan and Mr. Moser (Doc. 40, ¶ 35, Doc. 46, Exs. F-G), Defendants already had materially breached the Franchise Agreements by failing to pay amounts due pursuant to the same, and LSI already had terminated the franchise for such material breaches, as explained above.  Defendants have set forth no evidence of any duty LSI had to perform under the Franchise Agreements at the time it requested the personal guarantees, and the Court  is unable to discern any such duty from those Franchise Agreements.  As such, LSI did not anticipatorily repudiate the Franchise Agreement by requesting personal guarantees, and thus, did not breach the Franchise Agreements in this regard.  Summary judgment is granted to LSI, and denied to Defendants, on the issue of anticipatory repudiation.

b)  **Defendants' failure to perform**

Defendants' argument in opposition to LSI's breach of contract claim rests on whether LSI gave proper notice to the three franchises under the Franchise Agreements or anticipatorily repudiated the Franchise Agreements.  (*See* Docs. 39, pp. 10-16; Doc. 43, pp. 8-11; Doc. 44, pp. 15-16).  Defendants do not dispute that they were in default of certain of their obligations at various times, nor do they contend that they timely cured

those defaults prior to termination. (*See* Docs. 39, pp. 10-16; Doc. 43, pp. 8-11; Doc. 44, pp. 15-16). As the Court has found above that LSI substantially performed under the Franchise Agreements and did not anticipatorily repudiate those Franchise Agreements, there is no genuine issue of material fact as to whether Defendants Roundup, Yogi Michigan and Lakeside failed to perform their obligations under their respective Franchise Agreements. Therefore, summary judgment is granted to LSI, and denied to Defendants, on this element of LSI's breach of contract claim.

c) **Damages**

Given that the Court has found in favor of LSI on the first two disputed elements of LSI's breach of contract claim, it will now reach the issue of damages. LSI seeks damages for (1) royalties and other fees past due and owing under the Franchise Agreements, and (2) liquidated damages. (Doc. 36, pp. 8-11).

(1) Past due amounts

The Franchise Agreements provide that upon termination, the franchisees are to pay LSI "all sums then currently due and owing." (Doc. 40, Exs. 1-3, at Art. XI(c)). LSI contends that the sums due and owing from Defendants include royalties and other fees owed under the Franchise Agreements. Defendants do not dispute that LSI is entitled to past due amounts. As such, the Court finds that LSI is entitled to all sums due and owing at the time of termination of the Franchise Agreements. Any royalty and service fee, and any marketing, advertising and promotional fee, due and owing at the time of termination shall be calculated as set forth in the Franchise Agreements. (Doc. 40, Exs. 1-3 at Art. VI).

The Court notes, however, that there are genuine issues of material fact as to precisely when termination became effective. Although LSI has set forth evidence

suggesting that Defendants were aware of the termination at or near the time the notices were signed for at the campgrounds or the Pittsford, New York offices, Defendants have set forth evidence that suggests there was no presumption of delivery for those addresses to which the termination notices were mailed and that Defendants were not aware of those notices until, at the latest, March 21, 2011. Given these material factual disputes, the Court is unable to conclusively determine at this stage of the litigation when termination was effective. Consequently, the Court also cannot resolve the issue as to the precise past due amounts due and owing at the time of termination. Summary judgment is denied to both parties on this issue of damages.

(2)    Liquidated damages

The Court now turns to the question of whether the stipulated damages provision should be enforced as liquidated damages or is unenforceable as a penalty. LSI claims that the stipulated damages provision in the Franchise Agreements with Roundup and Yogi Michigan is a liquidated damages provision, and that it also is entitled to liquidated damages from Lakeside even though that Franchise Agreement does not contain a stipulated damages provision. (Doc. 36, pp. 8-11). Defendants contend that the award of liquidated damages is not warranted. (Doc. 39, pp. 16-17; Doc. 43, pp. 13-15). Specifically, Defendants argue that the liquidated damages provisions in the Roundup and Yogi Michigan Franchise Agreements are unenforceable because they operate as a penalty by not taking into account the months in which the camp resorts do not operate and the lack of profits by Defendants. (Doc. 39, pp. 16-17; Doc. 43, pp. 14-15). As for Lakeside, Defendants argue that LSI cannot recover liquidated damages under that

Franchise Agreement because there is no liquidated damages provision contained therein. (Doc. 39, pp. 16-17; Doc. 43, pp. 13-14).

Since "'[i]t is virtually the unanimous rule of all jurisdictions that whether a stipulation is for liquidated damages or a penalty is a question of law for the court,'" *Lake Ridge Acad. v. Carney*, 66 Ohio St. 3d 376, 380, 613 N.E.2d 183, 187 (Ohio 1993) *(*quoting *Ruckelshaus v. Broward Cnty. Sch. Bd.*, 494 F.2d 1164, 1165 (5th Cir. 1974)); *see also Harbours Condo. Ass'n v. Hudson*, 852 N.E.2d 985, 993 (Ind. App. 2006), the Court will determine the issue as a matter of law. It will start by analyzing the issue of liquidated damages with respect to Roundup and Yogi Michigan, and then will separately analyze the issue with respect to Lakeside.

### Roundup and Yogi Michigan

Under Ohio law, which governs the Roundup and Yogi Michigan Franchise Agreements, parties generally "are free to enter into contracts that contain provisions which apportion damages in the event of default." *Lake Ridge Acad.*, 66 Ohio St. 3d at 381. However, in certain circumstances, complete freedom of contract is not permitted for public policy reasons. *Id.* One of those circumstances is when stipulated damages constitute a penalty. *Id.* In other words, Ohio law instructs that liquidated damages clauses are valid and enforceable as long as the legitimate objective of the clause is reasonable compensation for actual damages, and not a penalty. *In re Graham Square, Inc.*, 126 F.3d 823, 829 (6th Cir. 1997) (citing *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St. 3d 27, 28, 465 N.E.2d 392, 393 (Ohio 1984)). In determining whether a stipulated damages clause is enforceable, "'[n]either the parties' actual intention as to its validity nor their characterization of the term as one for liquidated damages or a penalty

is significant in determining whether the term is valid.'" *In re Graham Square, Inc.*, 126 F.3d at 829 (quoting *Lake Ridge Acad.*, 613 N.E.2d at 188 (citations omitted)). Instead, the Ohio Supreme Court has set forth the following test for determining whether a stipulated damages clause is enforceable:

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

*Samson Sales*, 12 Ohio St. 3d at 29.

In conducting the required analysis of the Franchise Agreements with Roundup and Yogi Michigan, this Court concludes that the stipulated damages in this case are unenforceable penalties. Specifically, it is the consideration of Article XI(c) in light of the evidence before the Court and the Franchise Agreements as a whole that leads the Court to find that the stipulated damages provision is unreasonable and so disproportionate in amount such that it operates as an unenforceable penalty.

As an initial matter, the Court recognizes that the damages that could result from a breach of the Franchise Agreements are "uncertain as to amount and difficulty of proof." Article XI(c) of the Franchise Agreements indicates that the loss of a franchisee in the campground industry does not lend itself to a precise calculation of future damages. (Doc. 40, Exs. 1-3; *see also* Doc. 37, ¶ 15). Mr. Schutter testifies that this is because the loss of a franchise over time is difficult to predict, and the best indicator of future loss is the amount that has been payable by the franchisee prior to termination.

(Doc. 37, ¶ 15). The Sixth Circuit likewise has previously recognized that franchises bring with it not only a certain amount of royalties, but also "additional intangibles such as brand recognition and loyalty, and a competitive presence in the geographic region." *La Quinta Corp. v. Heartland Properties* LLC, 603 F.3d 327, 340 (6th Cir. 2010); *see also* (Doc. 36, p. 9). Moreover, Defendants do not dispute that damages could arise from a breach of the Franchise Agreement are uncertain or difficult to prove. (*See generally* Doc. 39, pp. 16-17; Doc. 43, pp. 14-15; Doc. 51, pp. 10-11).

The Court also recognizes that Defendants have offered neither evidence nor argument that shows that stipulated damages provisions were unconscionable or were not entered into at arm's length by the parties. There is no indication that Roundup or Yogi Michigan were forced to enter into the Franchise Agreements with LSI as proposed, or were not free to negotiate with another franchisor if it did not agree with the terms proposed to it by LSI. (*See generally* Doc. 39, pp. 16-17; Doc. 43, pp. 14-15; Doc. 51, pp. 10-11). Notably, the Lakeside Franchise Agreement did not contain a liquidated damages provision. (*See generally* Doc. 40, Ex. 3).

Although those other considerations weigh in favor of finding the stipulated damages provisions to provide for liquidated damages, the reasonableness and proportionality inquiries do not. To explain why the Court finds the stipulated damages provision unreasonable and to result in an amount of damages disproportionate to the probable damages to be sustained by LSI, we must start by looking closely at Article XI(c) to ascertain the formula to be used to calculate the stipulated damages.

The Franchise Agreements for Roundup and Yogi Michigan provide for liquidated damages, as follows:

(c) Liquidated Damages. In the event this Agreement is terminated for any reason other than a default of LSI hereunder, FRANCHISEE shall pay to LSI, within fifteen (15) days after the effective date of termination, all sums then currently due and owing, **plus liquidated damages in an amount to be determined as follows: (1) all sums then currently due and owing, plus the monthly average royalty and service fees paid or due to LSI from FRANCHISEE for the three (3) year period immediately preceding the effective date of termination . . .; (2) shall be multiplied by the number of months remaining in the term of this Agreement; (3) which amount shall be reduced to the present value of such payments as of the date of termination assuming that such payments are made in equal amounts on January 1 of each calendar year remaining in the term of this Agreement, utilizing an interest rate of five percent (5%). . . .** FRANCHISEE acknowledges and agrees the LSI's damages and lost opportunities upon termination of the Agreement will be difficult to ascertain and that the foregoing formula is a reasonable estimate thereof and does not constitute a penalty or forfeiture. LSI's right to liquidated damages is cumulative with all other available remedies.

(Doc. 40, Exs. 1-2 at Art. XI(c)).[15] Based on the above language, the formula for calculating the stipulated damages is:

> All sums then currently due and owing
>
> **+** the monthly average royalty and service fee paid or due by franchisee for the three years immediately preceding termination
>
> **x** the number of months remaining on Franchise Agreement
>
> ———————————————
>
> Total amount, which is then reduced to present value

This formula is not the same as the formula applied by LSI in arguing that the stipulated damages provision is reasonable and proportionate. (*See* Doc. 36, pp. 8-11, Doc. 45, pp. 11-13; Doc. 50, p. 11). However, in determining whether the stipulated damages

---

[15]The Franchise Agreement between LSI and Roundup further defines the "Base" component in the calculation, providing that the Base "shall be no less than the minimum aggregate royalty and service fee and marketing, advertising and promotion fee provided in Paragraph (b) of Article VI" of the Franchise Agreement. (Doc. 40, Ex. 1 at Art. XI(c)).

provision is valid as a liquidated damages provision, the Court considers the formula as it is written in Article XI(c) of the Franchise Agreements.

To start, the Court considers whether the use of the monthly average royalty and service fees paid or due by the franchisee for the three years immediately preceding termination is reasonable. This component of the stipulated damages formula relies on historic figures of royalties and fees that already were calculated pursuant to the terms of the Franchise Agreements. The use of those figures to calculate future amounts owed would be consistent with the Franchise Agreement and would take into account the individual financial circumstances of the franchisee. The Court also finds it is reasonable to use historic payments owed by a franchisee to predict the future amounts that would be payable to LSI by the franchisee absent a breach. Although Roundup and Yogi Michigan take issue with the fact that the royalties and fees are calculated from the general revenue rather than the profits, that calculation is consistent with the manner in which the royalties and service fees were calculated while the Franchise Agreements were in effect so as to bear a reasonable relationship to probable future losses. Moreover, those royalties and service fees are averaged using the monthly averages for the three-year period immediately preceding termination, which accounts for possible peaks and valleys in the revenues of the franchisees due to seasonal demand or otherwise, thereby minimizing the concern that the franchisees would be paying damages for months when they were earning little or no revenue. Given this analysis, the Court finds that the use of a monthly average royalty and service fee to calculate stipulated damages provides a reasonable correlation to potential actual damages that could be sustained by a breach.

Turning next to the use of the number of months remaining on the Franchise Agreement as a multiplier, the Court again finds that it is reasonably correlated to a probable actual loss by LSI for a breach of the Franchise Agreements. If the franchisee were to fully perform under the Agreement, LSI would be entitled to royalties and fees for the remainder of the contractual term. Further, as explained above, there are a number of intangible issues that could result from a breach of the Franchise Agreements that may take time for the franchisor to resolve even though the exact time needed to resolve those issues cannot be estimated at the outset of the franchisor-franchisee relationship. As such, the Court finds that this component of the damages formula also is reasonable and fair.

Next, the Court will look at the use of all sums then currently due as part of the stipulated damages formula. Notably, LSI re-writes the formula to exclude this component, and thus, makes no argument and sets forth no evidence as to how the inclusion of all past due amounts in the stipulated damages formula correlates to the actual losses that could result from a breach of the Franchise Agreements. There also is no evidence before this Court that would suggest such a reasonable correlation exists. Under the termination provision in Article XI(c) of the Franchise Agreements, Roundup and Yogi Michigan are to pay LSI all past due amounts following termination. (Doc. 40, Exs. 1-2 at Art. XI(c)). In addition to those past due amounts, LSI is to receive stipulated damages to be calculated using the formula outlined above. (Doc. 40, Exs. 1-2 at Art. XI(c)). As such, the past due amounts are not only to be paid in full at the time of termination but they also are to be paid prospectively for all of the remaining months on the contract. (*See* Doc. 40, Exs. 1-2 at Art. XI(c)). This component of the formula,

however, does not take into account the precise amount due or the period of time that those past due amounts cover. If the past due amounts cover multiple months, then the franchisee must continue to pay multiple months' worth of royalties and fees for each month left on its contract independent of the average monthly fee already being paid. Although such a provision may incentivize the franchisee to pay timely, it also provides an incentive for the franchisor to postpone termination of the relationship until significant past due amounts have accrued so as to obtain a larger recovery of liquidated damages. The Court, however, cannot discern a correlation between the past due amounts and actual damages that could be sustained by LSI. Therefore, it finds that the liquidated damages are disproportionate and unreasonable when compared to probable actual losses to be sustained.

The application of the stipulated damages formula to the facts of this case illustrates the unreasonableness and disproportionality of the stipulated damages to the probable harm. As explained above, there are genuine issues of material fact as to when termination was effective in 2011, and therefore, the precise past due amounts owed by Roundup and Yogi Michigan have not been determined nor has the precise time from which liquidated damages would be calculated been conclusively determined. However, since LSI calculates the liquidated damages from July 18, 2011, the Court will use the figures provided by LSI for the purported past due amounts for 2010 and for the period between January 2011 and July 2011 for both Roundup and Yogi Michigan in conducting the illustrative application of the formula. (Doc. 37, ¶¶ 13-14). For Roundup, those past due amounts include $19,979.19 for 2010 and $24,793.44 for January 2011 through July 2011, which totals $44,772.63. (Doc. 37, ¶¶ 13-14). For

Yogi Michigan, those past due amounts include $12,293.12 for 2010 and $24,793.44 for January 2011 through July 2011, which totals $37,086.56. (Doc. 37, ¶¶ 13-14). The Court also assumes for the purposes of this example that LSI's calculations as to monthly averages are accurate. Applying the formula as written in the Franchise Agreements, the calculation of the stipulated damages for Roundup is as follows:

| Past Due Amounts *Plus* Monthly Average | $44,772.63<br>+<br>$3,150.77 |
|---|---|
| *Multiplied by* Months Remaining on Franchise Agreement | 53 |
| Total | $2,539,940.20, which is then reduced to present value[16] |

Similarly, the calculation for stipulated damages for Yogi Michigan is:

| Past Due Amounts *Plus* Monthly Average | $27,729.13<br>+<br>$2,729.13 |
|---|---|
| *Multiplied by* Months Remaining on Franchise Agreement | 5 |
| Total | $149,949, which is then reduced to present value[17] |

The amount of stipulated damages that would be due by Roundup and Yogi Michigan using the formulas set forth in the above tables are approximately 11 times what would be owed if only the average royalty and service fees were multiplied by the

---

[16] For comparison, the Court also has calculated the total amount of stipulated damages using only the 2010 past due amounts of $19,979.19 plus the $3,150.77 and has multiplied that total by 53 months, for a final amount of stipulated damages of $1,225,887.88, reduced to present value.

[17] For comparison, the Court also has calculated the total amount of stipulated damages using only the 2010 past due amounts of $7,191.71 plus the monthly average fee of $2,729.13 and has multiplied that total by 5 months, for a total amount of stipulated damages of $ 49,604.20, which is then reduced to present value.

remaining months of the Franchise Agreement as proposed by LSI (*see* Doc. 36, p. 10).[18]  Although the Court recognizes that the figures may not be exact given the material issues of fact with respect to the past amounts due and the time from which the liquidated damages should be calculated, the Court finds that any variances in the amounts would not be of such significance to alter the Court's conclusion.  Likewise, the Court recognizes that some leeway should be given in determining damages that are not easily calculated, as that is the essence of a stipulated damages provision. However, given the lack of correlation between the past due amounts and future probable losses, and under the facts and circumstances of this case, the Court finds that enforcement of the stipulated damages provision as written would be result in the imposition of damages that are not reasonably correlated with, and are disproportionate to, the probable harm suffered by LSI.

The case *Shree Ganesh, Inc. v. Days Inns Worldwide, Inc.*, 192 F. Supp. 2d 774, 785-86 (N.D. Ohio 2002), although not binding, is instructive.  There, the court considered an issue similar to this case under New Jersey law.  *Id.*  In that case, the stipulated damages provision of a franchise agreement provided stipulated damages in an amount equal to accrued Recurring Fees over the immediately preceding 24-calendar months except that in no event could the amount payable be less than $2,000 multiplied by the number of guest rooms in the facility.  *Id.* at 785.  The provision provided that the stipulated damages were not a penalty, and that the actual damages would be difficult to ascertain. *Id.*  In evaluating whether to enforce the stipulated

_____

[18] Even applying the lesser amount calculated using the 2010 past due amounts only, the stipulated damages for Roundup still would be approximately 8 times the amount owed using only the average royalty and service fees for the remaining months, and the stipulated damages for Yogi Michigan would be approximately 3.7 times the amount owed using only the average royalty and service fees for the remaining months.  (*See* Doc. 36, p. 10; Doc. 37, ¶ 13).

damages provision as liquidated damages, the court stated that New Jersey law gave favorable treatment to liquidated damages clauses and upheld those clauses where it "'constitutes a reasonable forecast of the provable injury resulting from the breach,' and where harm 'is incapable or very difficult of accurate estimate.'" *Id.* at 786 (quoting *Wasserman's, Inc. v. Twp. of Middletown*, 137 N.J. 238, 645 A.2d 100, 106-07 (N.J. 1994)). Although the court recognized that the damages were not easily ascertainable and that there was no dispute that the parties intended to enforce the damages clause, it ultimately concluded that the stipulated damages provision was unreasonable and therefore was an unenforceable penalty. *Id.* at 786. In finding it unreasonable, the court stated that the amount of damages based on the number of rooms is approximately five times the amount that would have resulted if the calculation were based on the recurring fees, which in that court's opinion was clearly excessive. *Id.* at 786-87. As such, the court struck the stipulated damages provision, requiring the plaintiff to prove actual damages at trial. *Id.* at 787.

Similar to *Shree Ganeesh*, the damages to be paid pursuant to the stipulated damages provision here must be reasonably correlated to the probable harm to be suffered. *In re Graham Square, Inc.*, 126 F.3d at 829 (citing *Samson Sales*, 12 Ohio St. 3d at 28). For the reasons explained above, the Court finds that they are not. As such, the stipulated damages as calculated pursuant to the Franchise Agreements operate as an unenforceable penalty. Summary judgment is denied to LSI, and granted to Defendants, as to the liquidated damages provision under the Roundup and Yogi Michigan Franchise Agreements. Article XI(c) of the Roundup and Yogi Michigan Franchise Agreements is stricken. LSI will be required to prove any amount of

damages to which it believes it is entitled to under the Franchise Agreements at trial. *See Shree Ganesh, Inc.*, 192 F. Supp. 2d at 787; *see also Carter v. CPR Staffing, Inc.*, No. 94671, 2010 Ohio App. LEXIS 5067, at *6 (Ohio App. Dec. 9, 2010) (recognizing liquidated damages as being damages sought in lieu of actual damages) (citing Black's Law Dictionary (7 Ed. 1999), 395).[19]

*Lakeside*

"Courts in Indiana have long recognized the freedom of parties to enter into contracts and have presumed that contracts represent the freely bargained agreement of the parties." *Trimble v. Ameritech Publ'g*, 700 N.E.2d 1128, 1129 (Ind. 1998). Where a damages clause is designed to exculpate or limit damages, Indiana courts will generally enforce those provisions as a product of a freely bargained agreement between the parties. *Gen. Bargain Ctr. v. Am. Alarm Co.*, 430 N.E.2d 407, 410-12 (Ind. App. 1982).

Likewise, where there exists a stipulated damages provision that provides for the forfeiture of a stated sum of money without proof of damages, such a provision generally is enforceable if the nature of the agreement is such that when a breach occurs the resulting damages would be uncertain and difficult to ascertain. *Harbours*, 852 N.E.2d at 993; *Olcott Int'l & Co. v. Micro Data Base Sys.*, 793 N.E.2d 1063, 1077 (Ind. App. 2003). "However, to be enforceable the *stipulated sum* must fairly be allowed as compensation for the breach." *Olcott Int'l & Co.*, 793 N.E.2d at 1077 (emphasis added). A party seeking to enforce a liquidated damages clause need not prove actual damages, but may be required to show a correlation between the liquidated damages

---

[19]The Franchise Agreements provide that the right to liquidated damages is cumulative with all other available remedies. (Doc. 40, Exs. 1-2 at Arts. XI(c), XIII(j)).

and actual damages in order to assure that a sum charged may be fairly attributed to the breach. *Harbours*, 852 N.E.2d at 993.

Here, LSI concedes that the Lakeside Franchise Agreement does not contain a liquidated damages provision. (*See* Doc. 36, p. 10; *see also* Doc. 40, Ex. 3). However, it asks the Court to award such damages in favor of LSI and against Lakeside because the rationale applicable to its ability to recover expectation damages against Roundup and Yogi Michigan is equally applicable to Lakeside. (Doc. 36, p. 11). LSI asks the Court to apply the same formula for calculating those expectation damages as is used to calculate the liquidated damages against Roundup and Yogi Michigan. (Doc. 36, p. 11). LSI relies on the damages provision of the Franchise Agreement, which provides:

> (c) <u>Damages</u>. In the event this Agreement is terminated for any reason other than a default of LSI hereunder, FRANCHISEE shall, without prejudice to any other right or remedy of LSI with respect to such termination, pay to LSI, within fifteen (15) days after the effective date of termination, all sums then currently due and owing.

(Doc. 40, Ex. 3 at Art. XI(c)). LSI's argument is that the damages provision does not limit its remedies against Lakeside. (Doc. 36, p. 11).

Although the Court agrees with LSI that the damages provision does not limit its ability to seek other contractual remedies from Lakeside, the Court does not agree that LSI is entitled to an award of liquidated damages. For one, the Franchise Agreement does not contain a stipulated damages provision, as it contains no statement concerning an anticipated and pre-determined sum of money to which LSI is entitled to without proof of damages in the event of a breach. It also contains no formula for determining such damages. Further, LSI has not provided any support for awarding liquidated damages where there is not a liquidated damages provision in the agreement. In light of the undisputed facts, the Court finds that there is nothing that

suggests that the parties intended for LSI to be awarded liquidated damages in the event of a breach by Lakeside, and therefore, it declines to read such an intent into the Franchise Agreement. Notably, however, even if the Court were to find that the Franchise Agreement contained a provision that provided for liquidated damages, such a provision still would be unenforceable as a penalty under Indiana on the same bases explained above with respect to Roundup and Yogi Michigan.

Accordingly, summary judgment is denied to LSI as to liquidated damages from Lakeside, and LSI is required to prove the amount of damages to which it believes it is entitled at trial.[20]

## 2. Unfair competition by Defendants

LSI seeks summary judgment on its unfair competition brought under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Ohio common law, based on Defendants purportedly unauthorized use of the Subject Marks of LSI. (Doc. 36, pp. 13-14). Defendants filed a cross-motion for summary judgment on LSI's unfair competition claims, contending that they never used the Subject Marks in an unauthorized manner because LSI's termination notice was never effective and Defendants voluntarily de-identified by July 2011 pursuant to the terms of the Franchise Agreements after receiving verbal notification in June 2011 that termination was being implemented. (Doc. 39, pp. 18-19).

---

[20]The Court notes that although there is no genuine issue of fact on this issue, it declines to grant summary judgment to Defendants because Defendants did not move summary judgment on LSI's breach of contract claim on the issue of liquidated damages as to Lakeside. (*See* Doc. 39, pp. 16-18; Doc. 51, pp. 10-11).

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), establishes a federal cause of action for unfair competition. *GMC v. Keystone Auto. Indus.*, 453 F.3d 351, 354 (6th Cir. 2006). Section 43(a) provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). To determine whether unfair competition exists, the Sixth Circuit considers (1) whether the marks of the plaintiff were used by the defendant without the consent of the plaintiff, and (2) the likelihood of confusion between the marks of the plaintiff and the marks of the defendant. *U.S. Structures, Inc. v. J.P. Structures, Inc.* 130 F.3d 1185, 1190 (6th Cir. 1997); *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)); *Frisch's Rests. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 647 (6th Cir. 1982).[21] Typically, the Court must consider eight factors in assessing the likelihood of confusion. *Daddy's Junky Music Stores. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (citing *Frisch's*, 670 F.2d at 448). These eight factors

---

[21]This is the same test that also is used to decide trademark infringement and false designation or origin. *Audi AG,* 469 F.3d at 542 (citing *Two Pesos*, 505 U.S. at 780).

include: (1) strength of the mark, (2) relatedness of goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) intent of the defendant in selecting the mark, and (8) likelihood of expansion of the product line. *Id.* However, when a defendant continues its unauthorized use of an original trademark after its license to use the trademark has been terminated, consideration of the eight factors is unnecessary as such evidence is sufficient proof of likelihood of confusion. *U.S. Structures, Inc.*, 130 F.3d at 1190.

The same analysis that applies to an unfair competition claim under the Lanham Act also applies to an unfair competition claim under Ohio law. *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003); *Abercrombie & Fitch Stores. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 n.2 (6th Cir. 2002); *Victoria's Secret Stores v. Artco Equip. Co.*, 194 F. Supp. 2d 704, 724 n.8 (S.D. Ohio 2002). As such, the below discussion of the Lanham Act claim encompasses the Ohio unfair competition claim as well. *See ETW Corp*, 332 F.3d at 920; *Abercrombie & Fitch Stores*, 280 F.3d at 626 n.2; *Victoria's Secret Stores*, 194 F. Supp. 2d at 724 n.8.

Defendants' first argument goes to the issue of consent. Defendants contend that because none of LSI's termination notices were effective, Defendants were never terminated and had the right to continue to use LSI's marks. (Doc. 39, p. 18; Doc. 43, pp. 15-20; Doc. 51, pp. 11-13). Defendants point out, however, that they voluntarily de-identified within the time provided for in the Franchise Agreement after receiving verbal notice of termination in June 2011. (Doc. 39, p. 18; Doc. 43, pp. 15-20; Doc. 51, pp. 11-13). The Court disagrees with Defendants' analysis.

Defendants' entire defense to the unfair competition claim of LSI rests on whether LSI properly terminated the Franchise Agreements. (*See* Doc. 39, pp. 18-20; Doc. 43, pp. 15-20; Doc. 51, pp. 11-13). Since, as explained above, the Court has found that termination of the Franchise Agreements was effective at the time Defendants became aware of LSI's February 24, 2011 termination notices but no later than March 21, 2011, Defendants' argument fails. Contrary to Defendants' argument, Defendants indeed were holdover licensees like those in *U.S. Structures, Inc.*, 130 F.3d at 1185, who continued to use LSI's marks after the Franchise Agreements were terminated. At the time termination was effective, the Franchise Agreements provided that "all rights of FRANCHISEE hereunder shall terminate" and that "FRANCHISEE shall immediately thereafter cease to use in any manner, directly or indirectly, the System or any part thereof." (Doc. 40, Exs. 1-3 at Art. XI(d)). Included in such System is the Subject Marks of LSI. (Doc. 40, Exs. 1-3 at Art. XI(d)). The Franchise Agreements further provide that the Franchisee "distinguish the CAMP-RESORT thereafter so clearly from JELLYSTRONE PARK CAMP-RESORTS and those within the Network as to avoid all possibility of any confusion by the public." (Doc. 40, Exs. 1-3 at Art. XI(d)). In the February 24, 2011 termination notices, LSI informed Defendants that pursuant to that provision they were to de-identify. (Doc. 38, Exs. A-C). As such, Defendants were unauthorized users of LSI's marks once the Franchise Agreements were terminated. *See Am. Speedy Printing Ctrs. v. AM Mktg., Inc.*, 69 Fed. Appx. 692, 701 (6th Cir. 2003).

Although there is a genuine issue of material fact as to exactly when Defendants were effectively terminated, such termination occurred no later than March 21, 2011.

Defendants, however, concede that they did not de-identify until at least July 2011 (Doc. 39, pp. 18-20; Doc. 43, pp. 15-20; Doc. 51, pp. 11-13). As such, there is a window of time after termination wherein Defendants' use of LSI's marks was unauthorized. Defendants make no argument and present no evidence to the Court to demonstrate for the entire period following effective termination in or about March 2011, LSI gave Defendants consent to continue using the marks, and the Court is not required to search the record for some piece of evidence which might stave off summary judgment, *U.S. Structures, Inc.*, 130 F.3d at 1191 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)). Even if the Court were to rely on evidence relating to Defendants' attempts to negotiate a resolution with LSI after termination, that evidence alone is insufficient to raise a genuine issue of material fact as to post-termination consent to use the marks of LSI. *See U.S. Structures, Inc.*, 130 F.3d at 1187 (even where the parties were attempting to negotiate a resolution after termination, the court held that no genuine issue of material fact existed as to consent where the plaintiff offered testimony that it did not consent to continued use of the trademark and defendants opposed it with inadmissible and irrelevant evidence). While the Court recognizes that there are genuine issues of material fact as to whether Defendants had a reasonable time within which to de-identify under the Franchise Agreement following termination and as to the willfulness and intent of Defendants in continuing to use the marks after termination (*see* Doc. 51, pp. 11-12), the Court finds that those disputes are more appropriately addressed with the issue of damages. As such, the Court finds that Defendants were unauthorized users of LSI's marks, but that the precise time at which Defendants became unauthorized users is subject to genuine issues of material fact.

Turning to the second issue regarding the likelihood of confusion, the Court finds that it is unnecessary to consider the eight factors. Defendants' continued use of LSI's marks after termination is sufficient to demonstrate a likelihood of confusion. *U.S. Structures, Inc.*, 130 F.3d at 1190 (holding "that proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion'" and that the district court did not err in concluding that the plaintiff satisfied the likelihood of confusion test "without considering all of the *Frisch's* factors individually"). Nevertheless, even if the Court were to consider the eight factors, Defendants' only dispute as to those factors is with regard to their intent. (Doc. 39, p. 20). Defendants contend that there is no evidence that they intended to deceive the public in any manner regarding the branding of their campground facilities. (Doc. 39, p. 20). However, that argument does not preclude summary judgment. As the Sixth Circuit has recognized:

> a showing of intent is not required to demonstrate the likelihood of confusion (*see, e.g.*, *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 (6th Cir. 2004)). While a "defendant's intent" is one of the eight factors noted above, it is considered only in the sense that its existence can "strengthen[] the likelihood of confusion" (*Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir. 1996)). Its absence, on the other hand, does not preclude such likelihood (*id.*). After all, if "potential purchasers are confused, no amount of good faith can make them less so" (*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 596 (5th Cir. 1985)).

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.* 453 F.3d 377, 381 (6th Cir. 2006). Accordingly, there is no genuine issue of material fact as to a likelihood of confusion.

For the foregoing reasons, summary judgment is granted to LSI, and denied to Defendants, on the issue of liability for LSI's unfair competition claims. The case shall proceed on the issue of when such liability arose and on the issue of damages

44

recoverable on LSI's unfair competition claim. (*See* Doc. 36, p. 19) (requesting that any ruling on damages be withheld until a supplemental proceeding or trial).

### B.    Defendants' Counterclaims

#### 1.    Breach of contract by LSI

Defendants and LSI have filed cross-motions for summary on Defendants' counterclaim against LSI for breach of contract. (Doc. 39**,** p. 21; Doc. 41, p. 10). Defendants seek summary judgment on the basis that LSI purportedly failed to send proper default and termination notices and purportedly repudiated the contract anticipatorily by requesting personal guarantees. (Doc. 39, p. 21). LSI, on the other hand, seeks summary judgment on the basis that Defendants failed to properly allege a claim for breach of contract and that even if they did, there was no breach by LSI. (Doc. 41, p. 10).

For the reasons explained *supra* as to LSI's claim for breach of contract, summary judgment is denied to Defendants, and granted to LSI, on Defendants' breach of contract counterclaim against LSI.

#### 2.    Defamation

LSI seeks summary judgment on Defendants' counterclaim for defamation on two grounds: (1) the statements were constitutionally protected opinions; and (2) LSI had a qualified privilege. (Doc. 41, pp. 5-8). Defendants disagree (Doc. 44, pp. 5-13); however, they have not filed a cross-motion for summary judgment on this counterclaim.

In Ohio, defamation occurs when a publication contains a false statement "'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person

adversely in his or her trade, business or profession.'" *Jackson v. City of Columbus*, 117 Ohio St. 3d 328, 331 (Ohio 2008) (quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St. 3d 1, 7 (1995)).[22]  The elements that must be shown to prove a claim for defamation are:  (1) a false statement, (2) about the claimant, (3) that is published without privilege to a third party, (4) without fault or at least negligence on the part of the opposing party, and (5) that the statement was either defamatory per se or caused special harm to the plaintiff.  *Northeast Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne*, 183 Ohio App. 3d 104, 109 (Ohio App. 2009).  "'Defamation per se occurs when material is defamatory on its face; defamation per quod occurs when material is defamatory through interpretation or innuendo.'"  *Id.* (quoting *Gosden v. Louis*, 116 Ohio App. 3d 195, 206 (1996)).  If a claimant establishes a *prima facie* case of defamation, then the opposing party may invoke a conditional or qualified privilege.  *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 7 (citing *Hahn v. Kotten*, 43 Ohio St. 2d 237, 243, 331 N.E.2d 713 (1975).

In addressing whether LSI is entitled to summary judgment on Defendants' defamation claim, the Court first will address whether the statements at issue constitute facts or protected opinions.  It then will turn to the issue of qualified privilege.  For the reasons explained below, summary judgment is granted in part, and denied in part, to LSI on Defendants' defamation counterclaim.

### a)    Fact v. Opinion

In Ohio, expressions of opinion are constitutionally protected speech. *Scott v. News-Herald*, 25 Ohio St. 3d 243, 250, 496 N.E.2d 713 (1986).  In determining whether

---

[22]In moving for summary judgment on the defamation claim, LSI applies Ohio law . (Doc. 41, pp. 5-8).  In their opposition, Defendants do not dispute that Ohio law is applicable and indeed apply Ohio law in the analysis of their counterclaim.  (Doc. 44, pp. 5-13).

statements are expressions of fact or opinion, Ohio courts consider the totality of the circumstances. *Id.* Specifically, they consider: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared. *Id.* The Ohio Supreme Court has held that the ultimate determination as to whether a statement is a fact or opinion is a question of law for a court to decide. *Wampler v. Higgins*, 93 Ohio St. 3d 111, 127, 752 N.E.2d 962 (2001) ("We agree . . . that the applicability of the *Ollman/Scott/Vail* 'opinion privilege' in a given case is a question of law for the court.").

To determine whether the statements made by Mr. Ellison are fact or opinion, the Court must first identify the statements at issue. Here, the statements at issue are those made in Mr. Ellison's letter dated June 14, 2011 to Mr. Friel:

> We are very much aware of the circumstances of the Morgan Management operation. As a result we have terminated all the franchises under the Morgan Management ownership. It is a shame that through poor decisions and money management Morgan has taken a very successful operation and rendered it to the level it has become which is despicable. Hopefully there will be other campgrounds that will be interested in filling the void that these parks have left. We apologize for the inconveniences this has caused Yogi Bear campers but there was no positive response from Morgan to improve so it left us no choice.

(Doc. 40, ¶¶ 58-59 and Ex. 15; *see also* Doc. 42, Ex. B). From that letter, Defendants take issue with all but the fourth sentence and the first clause of the fifth sentence. (Doc. 44, pp. 5-13).

Having identified the relevant statements, the Court now looks at the sentences in light of the considerations set forth in *Scott*, 25 Ohio St. at 250. With respect to the first sentence, the Court finds there is no qualifying language in the sentence that suggests any belief or subjective opinions of Mr. Ellison; rather, the statement bespeaks

actual action by LSI or Mr. Ellison. Further, it would be possible to verify the "circumstances" of the Morgan Management operation of which LSI was aware. In considering that statement with the remainder of the letter, the relevant "circumstances" would be those that resulted in the termination of the franchises under the Morgan Management ownership, or of those about which Mr. Friel complained and to which Mr. Ellison was responding or referring. Therefore, the Court finds the first sentence to be a statement of fact.

The second sentence in the context of the letter similarly contains no qualifying language that suggests a belief or subjective opinion of Mr. Ellison; rather, it refers to affirmative action taken by LSI. Further, whether LSI terminated all of the franchises under the Morgan Management ownership and the reasons for such terminations are verifiable, as demonstrated by evidence as to the termination of the franchises and Mr. Ellison's testimony that he was aware of the reasons LSI terminated the franchise relationships. (Doc. 47, Ex. A, pp. 1-11). Therefore, the Court finds the second sentence to be a statement of fact.

The third sentence is a bit more challenging. As there are some words that could suggest a belief or subjective opinion, the Court must parse through the language. The initial phrase "[i]t is a shame" is a subjective expression of regret or sympathy from Mr. Ellison with respect to the circumstances, and is not subject to verification. Following that is an expression that in context indicates Morgan Management made "poor decisions" that lowered the quality of the franchise operations. Although the adjective "poor" is a subjective description of the decisions, it does not render the entire sentence an opinion. When that sentence is read as a whole, Mr. Ellison is expressing his

knowledge as to why the conditions deteriorated at the campgrounds. As such, the relevant part of the expression is whether decisions made by Morgan Management indeed affected the quality of the operations. As Mr. Ellison testified, it is possible to verify the conditions of the campgrounds over time through inspection reports and scores assessed by LSI, as well as through emails or other correspondence. (Doc. 41, Ex. 3, p. 11;[23] Doc. 47, Ex. A, pp. 9, 11). The next phrase in the context of the sentence refers to how Morgan Management managed the money for the three franchises (*i.e.*, where the money was spent), which would be verifiable by the financial records of the franchises. Similarly, whether the three franchise operations were "successful" and later became less successful also could be verified with those same types of documents. Although whether the franchise operations indeed became "despicable" cannot be substantiated since that constitutes a subjective belief and the interpretation of facts by an individual as to how bad he believed the conditions purportedly had become, the Court finds that when read in the context with the remainder of the sentence the word expresses a deteriorating condition of the franchise operations, which can be substantiated. Accordingly, the Court finds that the third sentence as a whole constitutes a statement of fact.

Finally, with respect to the second clause of the fifth sentence, the Court looks at the specific terms used in light of the totality of the circumstances. As an initial matter, the Court finds it is possible to verify whether or what type of response was received from Morgan. Whether, however, it would be possible to substantiate if a "positive" response was received could depend upon how the word is interpreted. On one hand,

---

[23]The citations to page numbers in regards to Doc. 41, Ex. 3 are to the page numbers provided by the Court's electronic filing system.

a positive response could be an affirmative response acknowledging issues raised and expressing an intent to improve, as opposed to no response or a response indicating that they would not improve. It also could be interpreted to mean a response that was satisfactory or favorable to LSI. In the context of the sentence, the Court finds that whether a "positive" response was received means an affirmative response indicating an intent to improve, which is verifiable. In any event, the Court finds that the statement as a whole is intended to reflect actual actions that occurred or did not occur, which can be substantiated. *See Rich v. Thompson Newspapers, Inc.*, 164 Ohio App. 3d 477 (Ohio App. 2005). As such, the second clause of the fifth sentence constitutes a statement of fact.

The Court also notes that when looking at the "broader social context" in which the statements were made, the letter was sent to resolve a customer complaint and to indicate action taken to resolve the issue. This type of letter, unlike a letter to the editor in a newspaper, would not signal to the reader that it is meant to constitute opinions rather than facts. *Rich*, 164 Ohio App. 3d at 486.

Since the Court has concluded that each of the disputed phrases constitute a statement of fact, the Court denies summary judgment on Defendants' defamation counterclaim to LSI on this basis.

Nevertheless, the Court will address the additional argument advanced by LSI, which is that in regards to the one statement that LSI believed could be interpreted as a fact – that the Defendant franchisees were terminated as a result "of the circumstances of the Morgan Management operation" –, there is no genuine issue of material fact as to its truth. (Doc. 41, p. 7; Doc. 52, pp. 2-4). As the Court will explain below, there are

genuine issues of material fact as to whether that statement was true, and therefore, the Court denies summary judgment to LSI on that issue as well.[24]

The statement at issue in this argument is that which provides that LSI terminated the franchises as a result "of the circumstances of the Morgan Management operation." (*See* Doc. 40, Ex. 15; Doc. 41, p. 7; Doc. 52, pp. 2-4). LSI contends that there is no genuine issue of fact that the circumstances to which Mr. Ellison was referring included the financial condition of Morgan Management. In support, LSI cites to the letter of Mr. Friel, which refers to Morgan Management's money management. (Doc. 52, p. 3). LSI argues that it is true that Morgan Management's franchises were terminated by LSI because of its financial condition as evidenced by its continuous defaults on paying royalties and other service fees as required by the Franchise Agreements. (Doc. 41, p. 7; Doc. 52, p. 3). Defendants, on the other hand, argue that the "circumstances" to which Mr. Ellison was referring was not the financial management, but rather was the condition of the camp resorts. (Doc. 47, Ex. A, pp. 16-17). Further, Defendants argue that Mr. Ellison knew, and does not dispute, that the franchises were not terminated because of the conditions of the campgrounds such that his statement was false. (Doc. 47, Ex. A, pp. 16-17).

The Court finds that there is a genuine issue of material fact as to what circumstances Mr. Ellison was referring to as being the basis for his termination. Therefore, we also find that there exists a genuine issue of material fact as to whether his representation was false. The letter from Mr. Friel references twelve specific

---

[24]The Court further notes that even if LSI had been granted summary judgment as to that statement, it would not be entitled to summary judgment on the defamation counterclaim as a whole. The Court determined above that there are multiple other statements of fact at issue, and LSI has not set forth any argument or any evidence that would demonstrate that those statements are true.

conditions of the campground about which Mr. Friel has complaints. (Doc. 42, Ex. 1). After listing those twelve complaints, Mr. Friel states: "Morgan Resorts takes money from its Northern camps and spends the money on its Nascar campgrounds improvements." (*Id.*). Mr. Ellison's letter in response references the "circumstances" of Morgan Management. (Doc. 42, Ex. 2). Moreover, when asked what he was referring to when he said LSI was "aware of the circumstances," Mr. Ellison testified: "Things that have come through, which I was aware of from our inspections." (Doc. 47, Ex. A, p. 5).[25] Construing those facts strongly in favor of Defendants as the Court is required to do on summary judgment, there is a genuine issue of material fact as to the circumstances to which Mr. Ellison was referring. Given that Mr. Friel's primary complaints about the campgrounds are related to the conditions, and he makes only one statement regarding the money management of Morgan Management, there is sufficient evidence to suggest that Mr. Ellison was referring to the campground conditions rather than the financial situation of Yogi Michigan or Morgan Management. There also is evidence that Mr. Ellison had knowledge that the Morgan franchises were not terminated because of the conditions of the campgrounds. (Doc. 47, Ex. A, pp. 6-7). As such, there are genuinely disputed facts concerning whether the statement, when construed to refer to the campground conditions, was false.

Even assuming that Mr. Ellison was referring only to the money management aspect of Mr. Friel's letter, there still is a genuine issue of material fact as to whether Mr. Ellison's statement was false. In his letter, Mr. Friel referenced Morgan Resorts' use of money from its northern camps for its Nascar campground improvements. (Doc. 42, Ex.

---

[25] The page number citations to Doc. 47, Ex. 1 are to the page numbers provided by the Court's electronic filing system.

1).  Mr. Ellison's response indicated that Morgan Resorts or its franchises had poor money management.  While Mr. Ellison admits that he was unaware of the financial management of Morgan Resorts and its franchises (Doc. 47, Ex. A, pp. 6-7, 10), he testified, and the evidence shows, that the termination was due to the failure to pay royalties.  (Doc. 47, Ex. A, p. 10).  Although failure to pay royalties could be a sign of mismanaging money, it does not automatically and conclusively demonstrate financial mismanagement.  Construing those facts in favor of Defendants, the Court finds that there is a genuine issue of material fact as to whether the statement, when construed to refer to financial mismanagement, was false.

Accordingly, the Court denies summary judgment to LSI as to the truth of the statement in the letter from Mr. Ellison to Mr. Friel regarding the termination of the three franchises.

b)    **Privilege**

The essential elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only.  *Hahn*, 43 Ohio St. 2d at 243; *see also Jackson*, 117 Ohio St. 3d at 331.  No single statement or formula can sufficiently describe when publication of defamatory matter should be conditionally privileged, but it is generally agreed that a publication is privileged when it is "'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'"  *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 8 (quoting *Hahn*, 43 Ohio St. 2d at 244).  Where the privilege is applicable, it does not attach to the communication but instead

attaches to the occasion on which it is made.  *Id.*  It does not change the actionable quality of the publication, but it heightens the required degree of fault to actual malice. *Id.* at 8-9.  Where the circumstances of the occasion for the alleged defamatory communications are not in dispute, the determination of whether the occasion gives rise to a privilege is a question of law for the court.  *Id.* at 7.

Here, there is no dispute over the circumstances of the occasion for the alleged defamatory communication, and the Court may decide the issue as a matter of law. Mr. Ellison's letter to Mr. Friel was sent in response to a customer complaint letter from Mr. Friel to LSI – the franchisor – regarding the Yogi Michigan campground run by Morgan Resorts at which Mr. Friel was a regular customer.  (Doc. 42, Exs. 1-2).  In the letter, Mr. Friel expresses discontent about Morgan Resort's management of the operation.  (Doc. 42, ¶ 7 and Exs. 1-2).  There is no dispute that the letter was sent to only Mr. Friel, the customer who complained.  (*See* Doc. 42, Ex. 2; *see also* Doc. 44, pp. 11-12).  There also is no dispute that LSI had a business interest to uphold in responding to Mr. Friel's letter.  (*See* Doc. 44, p. 11).  The information included in the letter, although allegedly defamatory, was limited in scope to attempting to address the concerns of Mr. Friel and to explaining to Mr. Friel the actions taken by LSI to resolve the situation.  (Doc. 42, ¶ 7 and Exs. 1-2).  Although Mr. Ellison may have been able to achieve the same result with less information (*see* Doc. 44, Ex. X), that does not mean that a communication containing more information is outside the scope of the concerns raised by Mr. Friel.  Here, the Court finds that Mr. Ellison's letter did not go beyond the scope of addressing Mr. Friel's concerns.

Further, Mr. Friel's communications appear to have been made in good faith.  In determining whether good faith exists, the Court need not concern itself with the motive or state of mind of the individual making the statement.  *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 10.  Instead, "'[a]ll that is necessary to entitle such communications to be regarded as privileged is, that the relation of the parties should be such as to afford reasonable ground for supposing an innocent motive for giving information.'"  *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 10 (quoting *Hahn*, at 43 Ohio St. 2d at 246) (additional internal quotations omitted).  Here, Mr. Ellison was contacted by telephone and then via letter by a disgruntled customer of one of LSI's franchisees.  (Doc. 42, ¶¶ 3-4 and Ex. 1).  Mr. Ellison handled the responses to customers' complaints as part of his job responsibilities, and he testified that he was trying to sympathize with Mr. Friel, a disgruntled customer of the franchise and its management operations, and "put the issue to rest" by responding to his concerns.  (Doc. 47, Ex. A, pp. 2, 8).  Although he did so in a way with which Defendants take issue, the Court finds that the relation of Mr. Ellison to Defendants and his relation to Mr. Friel is such as to afford a reasonable ground for supposing an innocent intent in giving the information set forth in Mr. Ellison's letter.  Accordingly, the Court concludes that the letter from Mr. Ellison to Mr. Friel was made on a privileged occasion, and summary judgment is granted to LSI on the issue of privilege.

However, that is not to say that Mr. Ellison's motive was actually innocent.  As such, the Court now must look at whether there is a genuine issue of material fact as to whether Mr. Ellison acted with actual malice in making the statements of fact.  "Actual malice" is defined as acting with knowledge that the statements are false or acting with

reckless disregard as to their truth or falsity. *Jacobs v. Frank*, 60 Ohio St.3d 111, paragraph two of the syllabus (1991). "Reckless disregard" exists when a publisher of defamatory statements acts with a "high degree of awareness of their probable falsity" or when the publisher "in fact entertained serious doubts as to the truth of his publication." *Jackson*, 117 Ohio St. 3d at 331 (internal quotations and citations omitted). The evidence of actual malice must be "clear and convincing" to defeat a qualified privilege. *A & B-Abell Elevator Co.*, 73 Ohio. St. 3d at 11.

Defendants argue that Mr. Ellison acted with actual malice in regards to his statement that LSI terminated the franchises "as a result" of the "circumstances" of which LSI was aware.[26] Mr. Ellison testified that at the time he wrote the letter to Mr. Friel the franchises had been terminated. (Doc. 47, Ex. A, p. 6). He also testified that the franchises were not terminated due to park conditions. (Doc. 47, Ex. A, pp. 6, 9). He specifically testified that it was false that the franchises were terminated due to poor campground conditions. (Doc. 47, Ex. A, p. 9). He testified that in responding to Mr. Friel's letter, he "follow[ed] the line of his letter" and that "there is no sense in arguing points with a customer." (Doc. 47, Ex. A, p. 7). Moreover, Mr. Ellison testified that the reason for the franchises termination of which he is aware is failure to pay royalties. (Doc. 47, pp. 16-17). LSI makes no argument, nor sets forth any evidence, that shows that Mr. Ellison did not know at the time he wrote the letter that the terminations were not the result of the campground conditions. As such, the Court finds that when the evidence is construed strongly in favor of the non-moving Defendants, as it must be at this stage of the litigation, it shows that Mr. Ellison knew of the correct reason for the

---

[26]With respect to the other statements in the letter, the Court notes that Mr. Ellison testified that he was aware of the conditions of the campgrounds.

termination of the franchise but fabricated a different reason for the termination so as to sympathize with the customer and ease the customer's concerns. However, the Court notes that if the evidence at trial shows that Mr. Ellison did not know of or have any serious doubt as to the reason for termination and simply failed to investigate before sending the letter to Mr. Friel, such evidence will be insufficient to prove actual malice. *See A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 13. Accordingly, summary judgment is denied to LSI on the issue of actual malice.

2. **Tortious Interference with Business Relations**

Ohio law recognizes a claim of tortious interference with contractual (or business) relations. *Dryden v. Cincinnati Bell Tel. Co.*, 135 Ohio App. 3d 394, 400, 734 N.E.2d 409, 413 (Ohio Ct. App. 1999).[27] The basic principle underlying a claim of tortious interference is that when someone acting without privilege, induces or purposely causes a third party to terminate a business relationship with another, then that person should be held liable for the harm resulting from the terminated relationship. *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 14. When a tortious interference claim is based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements as to defamation is equally applicable to the tortious interference claim. *Id.* at 15. To succeed on the tortious interference claim in such a case, the claimant must clearly and convincingly show that the communication was made with actual malice. *Id.* In other words, the actual malice standard required to defeat a qualified privilege in a defamation claim must also be met for tortious interference claim based on the same protected conduct or statements. *Id.*

---

[27] LSI applies Ohio law to the tortious interference claim, and Defendants do not dispute that Ohio law is applicable. (Doc. 41; Doc. 44).

Given that the same analysis that applied to privilege for defamation applies to the tortious interference, the Court incorporates its analysis and conclusion as to that issue here. In doing so, it finds that LSI is entitled to summary judgment on the issue of qualified privilege but is not entitled to summary judgment on the issue of actual malice. As such, the Court will continue its analysis of the merits of Defendants' counterclaim, given that LSI also has moved for summary judgment on this issue because Defendants have failed to show that LSI induced or purposely caused a third party to terminate a business relationship with another. (Doc. 41, p. 8).

The only third party about which Defendants have set forth any evidence or argument is Mr. Friel, a campground customer at Yogi Michigan. (*See* Doc. 41, pp. 8-9; Doc. 44, p. 14). As such, this third party is the only one that the Court will consider. The June 14, 2011 letter from Mr. Friel indicates that Mr. Friel had a damaged relationship with Defendants before Mr. Ellison sent his response letter. (*See* Doc. 42, Exs. 1-2). Mr. Friel's letter, however, does not indicate that Mr. Friel already had terminated his relationship with Yogi Michigan or Defendants such that if Mr. Friel had terminated his relationship *after* receiving Mr. Ellison's response letter, Defendants could satisfy this element. Nevertheless, Defendants have set forth no evidence that Mr. Friel subsequently terminated, or negatively changed, his relationship with Yogi Michigan or Defendants after receiving Mr. Ellison's letter. (*See generally* Doc. 44). Nor is there any evidence that any other customer terminated, or negatively changed, his or her relationship with any Defendants based on any communication from LSI. (*See generally* Doc. 44). Defendants therefore have failed to show a genuine issue of material fact as to this required element of their tortious interference counterclaim.

Accordingly, summary judgment is granted to LSI on Defendants' tortious interference counterclaim.

### 3.    **Ohio Deceptive Trade Practices**

The Ohio Deceptive Trade Practice Act prohibits conduct that "disparages the good, services, or business of another by false representation of fact."  Ohio Rev. Code § 4165.03(10); *see also A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 14. When a deceptive trade practices claim is based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements as to defamation is equally applicable to the deceptive trade practice claim.  *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 14-15.  To succeed on the deceptive trade practices claim in such a case, the claimant must clearly and convincingly show that the communication was made with actual malice. *Id.*  In other words, the actual malice standard required to defeat a qualified privilege in a defamation claim must also be met for deceptive trade practices claim based on the same protected conduct or statements. *Id.*

Given that the same analysis that applied to privilege for defamation applies to the deceptive trade practices claim, the Court incorporates its analysis and conclusion as to that issue here.  In doing so, it finds that LSI is entitled to summary judgment on the issue of qualified privilege but is not entitled to summary judgment on the issue of actual malice.  As this is the only issue raised by LSI in moving for summary judgment, Defendants' Ohio Deceptive Trade Practices claim as a whole survives.  Accordingly, summary judgment is granted in part, and denied in part, to LSI on Defendants' Ohio Deceptive Trade Practices counterclaim.

### 4.    **Injunction**

LSI has moved for summary judgment on Defendants' claim for an injunction because the Defendants' substantive counterclaims have no merit, and Defendants have failed to set forth any evidence of irreparable injury caused by LSI. (Doc. 41, pp. 10-11). Defendants have made no argument, nor set forth any evidence, to oppose LSI's motion. (*See generally* Doc. 44).

As to LSI's first argument, the Court has found that some of Defendants' counterclaims may proceed to trial. As such, summary judgment cannot be granted on the basis that their counterclaims lack merit. Nevertheless, irreparable injury is a prerequisite to injunctive relief, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *Audi AG*, 469 F.3d at 550. Defendants, having presented no argument or evidence as to irreparable injury, failed to meet their burden of proving that such irreparable injury exists for which injunctive relief is warranted. Accordingly, summary judgment is granted to LSI on Defendants' counterclaim for injunctive relief.

## II.  <u>CONCLUSION</u>

For the foregoing reasons, summary judgment is **GRANTED IN PART AND DENIED IN PART** to Plaintiff LSI, and summary judgment is **GRANTED IN PART AND DENIED IN PART** to Defendants. It is hereby ORDERED:

1.  As to LSI's claim against Defendants for breach of contract, summary judgment is:

    a.  GRANTED to LSI, and DENIED to Defendants, on the issue of LSI's performance and Defendants' failure to perform.

b.    DENIED to LSI, and DENIED to Defendants, as to damages relating to past due amounts owed by Defendants to LSI under Article XI(c) of the Franchise Agreements.  The case will proceed on this issue.

c.    DENIED to LSI, and GRANTED to Defendants, on the issue of liquidated damages.  The case will proceed on the issue of actual damages.

2.    As to LSI's claim against Defendants for unfair competition, summary judgment is:

a.    GRANTED to LSI, and DENIED to Defendants, on the issue of liability.

b.    The case will proceed on the issue of damages with respect to LSI's unfair competition claim pursuant to the Lanham Act and common law.

3.    As to Defendants' counterclaim against LSI for breach of contract, summary judgment is GRANTED to LSI, and DENIED to Defendants.

4.    As to Defendants' counterclaim against LSI for defamation, summary judgment is:

a.    DENIED to LSI on the issue of whether the statements in Mr. Ellison's letter to Mr. Friel constitute constitutionally protected opinions.

b.    DENIED to LSI as to the truth of the statement by Mr. Ellison in his letter to Mr. Friel that Defendants were terminated "as a result" of

the "circumstances of the Morgan Management operations." The case shall proceed on this issue.

    c.    GRANTED to LSI as to the existence of a qualified privilege.

    d.    DENIED to LSI on the issue of actual malice. The case shall proceed on this issue.

5.    As to Defendants' counterclaim against LSI for tortious interference, summary judgment is GRANTED to LSI.

6.    As to Defendants' counterclaim against LSI for deceptive trade practices, summary judgment is:

    a.    GRANTED to LSI as to the existence of a qualified privilege.

    b.    DENIED to LSI on the issue of actual malice. The case shall proceed to trial on the issue of actual malice.

7.    As to Defendants' counterclaim against LSI for an injunction, summary judgment is GRANTED to LSI.

**IT IS SO ORDERED.**

s/ Michael R. Barrett _____
Michael R. Barrett, Judge
United States District Court